UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                           :

UNITED STATES OF AMERICA,         :     <u>MEMORANDUM AND ORDER</u>
                           :     11-cr-857-WFK-2

      -against-                :

                           :

JOSE BARRERA,                   :

                           :

         Defendant.         :

                           :

------------------------------------------------------------X

Jose Barrera ("Defendant" or "Barrera") is charged with six counts in a seventeen-count indictment (the "Indictment"), which alleges various crimes on the part of several members of the street gang La Mara Salvatrucha, also known as MS-13 ("MS-13"). Currently pending before the Court are several of Defendant's pre-trial motions. First, Defendant moves to suppress evidence procured through the use of a wiretap on the phone of an alleged co-conspirator. Second, Defendant moves for an evidentiary hearing pursuant to *Franks v. Delaware* to ascertain whether and to what extent the Government provided misleading information in its applications for the wiretaps at issue, thereby affecting the determination of probable cause. Third, Defendant seeks discovery of law enforcement reports and witness or co-defendant statements relating to the wiretaps, pursuant to Rule 16 of the Federal Rules of Criminal Procedure. Fourth, Defendant seeks disclosure of any *Brady* material in the Government's possession. Fifth, Defendant moves for a bill of particulars with respect to two of the criminal counts with which he is charged, pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure. For the reasons set forth below, Defendant's motions are DENIED.

## I.    Factual Background

### A. The Criminal Enterprise

MS-13 is a violent street gang that was recently designated a transnational criminal organization by the U.S. Department of Treasury. Press Release, U.S. Department of Treasury, Treasury Sanctions Latin American Criminal Organization (Oct. 11, 2012), *available at* http://www.treasury.gov/press-center/press-releases/pages/tg1733.aspx. The gang operates in more than forty states through local "cliques," which report and funnel money to the group's central leadership in El Salvador. *Id.* MS-13 is involved in various serious transnational crimes, "including drug trafficking, kidnapping, human smuggling, sex trafficking, murder, assassinations, racketeering, blackmail, extortion, and immigration offenses." *Id.*

Upon joining MS-13, gang members agree to attack "chavallas"—*i.e.*, members of other gangs—whenever possible. Gov't Opp. Br. at 2. Since at least 1998, members of MS-13 in Queens and Long Island have carried out violent attacks against members of rival gangs. *Id.* at 1. Specifically, in Queens, MS-13 has been engaged in street wars against the Latin Kings, the Bloods and the Original Flushing Crew ("OFC"). *Id.* These street wars have resulted in multiple murders, shootings, and assaults on members of both MS-13 and rival gangs, as well as their family members and innocent bystanders. *Id.* at 1–2. Members of MS-13 often carry out orders "from regional, national, and international MS-13 leaders, including orders to kill witnesses, rival gang members, and potential cooperating or defecting MS-13 members." *Id.* at 2.

### B. Charges Against Barrera

Defendant is accused of being a member of an MS-13 clique based in Flushing, Queens, and of committing numerous crimes on behalf of the gang. *Id.* Defendant is charged in the first, second, fourth, fifth, eighth, and ninth counts of the Indictment. Count One charges Defendant

with engaging in racketeering from July 2009 to December 2011, committed as part of his involvement with MS-13, based on predicate acts of conspiracy to murder ("Racketeering Act One") and attempted murder ("Racketeering Act Three"). Indictment, Dkt. No. 1, at ¶¶ 6–8, 10. The Government alleges that between July 2009 and December 2011, Defendant conspired with co-defendants to murder members of the OFC, a rival gang located in Flushing, Queens. *Id.* at ¶ 8. The Government also alleges Defendant attempted to kill an unnamed victim ("John Doe") on September 24, 2010. *Id.* at ¶ 10. Count Two charges Defendant with racketeering conspiracy, based on an agreement with two co-defendants to commit the acts alleged in Count One. *Id.* at ¶¶ 12–14. Counts Four, Five, Eight and Nine charge Defendant with wrongs in connection with the predicate acts underlying Count One. Count Four charges Defendant with conspiracy to murder one or more persons, to wit: members of the OFC. *Id.* at ¶¶ 18–19. Count Five charges Defendant with unlawful use of a firearm in connection with conspiracy to murder as alleged in Count Four. *Id.* at ¶ 20. Count Eight charges Defendant with attempted murder of John Doe. *Id.* at ¶¶ 25–26. And, last, Count Nine charges Defendant with assault with a deadly weapon on John Doe. *Id.* at ¶¶ 27–28.

### C. The Initial Wiretap Application

On December 2, 2010, during its investigation of MS-13, the Government submitted an application, pursuant to 18 U.S.C. § 2518, for authorization to wiretap a cell phone used by Christian Merino ("Merino" a/k/a "Casper"), the alleged "primero" or leader of the Flushing, Queens clique of MS-13. *See generally* Def.'s Br., Ex. A ("Dec. 2, 2010 Aff."). On the same day, the Hon. Jack B. Weinstein issued an order authorizing the wiretap. *Id.*

Special Agent Sean Sweeney of Homeland Security Investigations ("HSI") submitted an affidavit in support of the Government's application for the wiretap. *Id.* According to the

affidavit, the Government was provided a wealth of information regarding the activities of MS-13 by a cooperating witness ("CW1"). For instance, CW1 recounted to Agent Sweeney a conversation with defendants Christian Merino, Nelson Quinteros ("Quinteros" a/k/a "Sonic"), and Alex Machado ("Machado" a/k/a "Negro") in which the three admitted to stabbing a member of a rival gang on September 24, 2010. *Id.* at ¶ 16a. CW1 also recorded phone calls in which Merino admitted to the September 24, 2010 stabbing, discussed an upcoming gang clique meeting, and mentioned a firearm that had been seized by the NYPD from co-defendant Wilber Baires in August 2010. *Id.* at ¶¶ 17, 20–21.

Furthermore, CW1 provided Agent Sweeney with information regarding two assaults planned by MS-13 members, which information allowed law enforcement to intervene and prevent those assaults. *Id.* at ¶¶ 16b–16c. On September 29, 2010, CW1 informed Agent Sweeney that a gang-related assault would occur that night in Murray Park, Flushing, Queens. *Id.* at ¶ 16b. HSI Special Agents and NYPD Detectives immediately responded to the location and encountered co-defendants Merino, Quinteros, and Negro hiding behind a fence, armed with a baseball bat. *Id.* The arrival of law enforcement caused the intended victims of the assault to flee. *Id.* On October 28, 2010, CW1 recorded an in-person conversation with Merino in which Merino indicated MS-13 gang members were planning to conduct a drive-by shooting against members of La Familia, a rival gang in Flushing. *Id.* at ¶ 16c. The next day, on October 29, 2010, a strong police presence near the area of the intended shooting caused the gang members to abort the plan. *Id.*

Agent Sweeney's affidavit explained why alternative investigative techniques—including some of the techniques outlined above, such as the use of a confidential witness and consensually recorded phone calls—were insufficient to achieve the goals of the investigation or were

4

otherwise too dangerous to be attempted. *Id.* at ¶¶ 50–69. The affidavit asserted CW1 did not have complete knowledge of MS-13's criminal activities or unrestricted access to its member base, either domestically or internationally. *Id.* at ¶¶ 52–55. Nor did law enforcement officers believe CW1 would be able to develop the types of relationships necessary to acquire such knowledge. *Id.* Furthermore, the affidavit claimed surveillance was of limited effectiveness due to MS-13's covert operating procedures and wariness of law enforcement. *Id.* at ¶¶ 52, 56, 58–61. Finally, Agent Sweeney explained in his affidavit that it would be difficult for an undercover agent to penetrate MS-13 and that the use of search warrants, grand jury subpoenas, and witness interviews would be premature. *Id.* at ¶¶ 56–57, 62–64.

### D. Reauthorizations of the Wiretap

On January 6, 2011, Agent Sweeney submitted an affidavit requesting an order of authorization to extend the wiretap on Merino's phone. *See generally* Def.'s Br., Ex. B ("Jan. 6, 2011 Aff."). Whereas Defendant was not mentioned in Agent Sweeney's initial application for a wiretap on Merino's phone, Defendant is named as a subject of the investigation in the January 6, 2011 affidavit through his alias, "Travieso." *Id.* at ¶ 1. Defendant was identified as a subject of the investigation "based on telephone calls intercepted pursuant to the December 2, 2010 order." *Id.* at ¶ 12c. The Hon. Jack Weinstein authorized the extension of the wiretap. *Id.* at 55. Notably, CW1 was able to attend and record a lengthy meeting between MS-13 gang members on January 25, 2011, falling within the first period of wiretap reauthorization. Def.'s Br., Ex. E (Excerpt of Transcript of MS-13 Meeting Recording).

Agent Sweeney submitted affidavits in support of additional extensions of the wiretap on February 3, March 2, and April 1, 2011. *See generally* Def.'s Br., Ex. F ("Feb. 3, 2011 Aff."); Def.'s Br., Ex. H ("March 2, 2011 Aff."); Def.'s Br., Ex. I ("April 1, 2011 Aff."). Every

5

application for authorization to extend the wiretap explained that alternative investigative techniques would, as previously described in the December 2, 2010 affidavit, be ineffective in achieving the goals of the investigation or otherwise be too dangerous to try. *See* Jan. 6, 2011 Aff. at ¶¶ 58–77; Feb. 3, 2011 Aff. at ¶¶ 57–76; March 2, 2011 Aff. at ¶¶ 56–77; April 1, 2011 Aff. at ¶¶ 46–67. The Court granted each of the Government's applications for authorization to extend the wiretap. *See, e.g.*, Jan. 6, 2011 Aff. at 55.

The affidavits submitted in support of each of the Government's applications described in detail multiple phone and text message conversations captured as a result of the wiretap, in which Merino discussed plans to commit murder, assault, and other crimes with fellow MS-13 members. *See, e.g.*, Feb. 3, 2011 Aff. at ¶¶ 17–31 (transcribing and interpreting conversations intercepted by the subject telephone). The communications also revealed contact information for various members of MS-13. *See, e.g., id.* For example, on December 20, 2010, Merino spoke with co-defendant Rudy Guembes-Lorena[1] and discussed killing a member of MS-13 suspected of stealing money from the gang's treasury. Jan. 6, 2011 Aff. at ¶ 25. On January 7, 2011, Merino had separate conversations with individuals known as "Pirata" and "Dimas" to discuss plans to kill a suspected cooperating witness. Feb. 3, 2011 Aff. at ¶¶ 21–22. On January 16, 2011, Merino spoke with "Scarface," a high-ranking member of MS-13 in Los Angeles, to discuss the re-formation of a previously existing chapter of MS-13 in Queens called the "Coronados." *Id.* at ¶¶ 25–26. On February 10, 2011, Merino sent a text message containing the phone numbers of two MS-13 members to another gang member. Mar. 2, 2011 Aff. at ¶ 24. Between March 16 and 18, 2011, Merino communicated with an El Salvador-based MS-13 member named Ismael Martinez via telephone and text message to discuss a wire transfer of MS-

---

[1] Agent Sweeney's affidavits reference co-defendant Rudy Guembes-Lorena as Rudy Guembes. *See, e.g.*, Jan. 6, 2011 Aff. at ¶¶ 1, 25.

13 funds to Martinez in order to facilitate an illegal reentry into the United States. Apr. 1, 2011 Aff. at ¶¶ 28–30.

The affidavits in support of the Government's wiretap applications asserted the wiretap on Merino's phone would continue to enable the Government to further the following goals: (1) discover the full scope of MS-13's criminal activities; (2) discover the identities and roles of all MS-13 members; (3) discover the stash locations of firearms, narcotics, and gang paraphernalia; (4) discover the management and disposition of proceeds generated by MS-13's illegal activities; and (5) obtain admissible evidence for future criminal prosecution of MS-13 members. *See, e.g.*, Dec. 2, 2010 Aff. at ¶ 38. With every application for an extension of the wiretap, Agent Sweeney identified new co-conspirators and new gang-related crimes as additional subjects of the investigation, based on telephone calls intercepted pursuant to the wiretap. Jan. 6, 2011 Aff. at ¶ 12c (adding fifteen new subject individuals); Feb. 3, 2011 Aff. at ¶ 12d (adding five new subject individuals); Mar. 2, 2011 Aff. at ¶ 12d (adding six new subject individuals and two new subject offenses); Apr. 1, 2011 Aff. at ¶ 12e (adding eight new subject individuals and one new subject offense). Additionally, the affidavits requested additional time for the wiretap because law enforcement had not yet been able to seize any firearms, narcotics, or gang paraphernalia based on the intercepted electronic communications. *See, e.g.*, Apr. 1, 2011 Aff. at ¶ 35. As such, Agent Sweeney asked for more time "to develop the investigation and identify locations where Merino and other MS-13 gang members are planning meetings, storing firearms, storing narcotics, and carrying out violent attacks against others." *Id.*

### E. Alleged Misleading Information in Agent Sweeney's Affidavits

Defendant claims Agent Sweeney provided the Court with two sets of material misrepresentations in the affidavits underlying the wiretaps at issue. Def.'s Br. at 12–13. The

first set relates to co-defendant Rudy Guembes-Lorena, who was first identified as a suspect in the case in Agent Sweeney's January 6, 2011 affidavit. *Id.*; Jan. 6, 2011 Aff. at ¶ 12c. According to Defendant, Agent Sweeney testified on January 21, 2011 that he had no information about Guembes-Lorena's criminal activity. Def.'s Br., Ex. D (Excerpts from Sept. 7, 2011 Suppression Hearing, 07-CR-116) ("9/7/2011 Tr.") at 11:12–20. However, this testimony is contradicted by the fact that Guembes-Lorena had been identified by Agent Sweeney as a subject of the wiretap weeks earlier, on January 6, 2011. Jan. 6, 2011 Aff. at ¶ 12c.

As recounted earlier, the wiretap recorded a conversation between Merino and Guembes-Lorena regarding the planned killing of an MS-13 member who had been stealing money from the gang. Jan. 6, 2011 Aff. at ¶ 25. In addition, the wiretap captured a conversation between Merino and Guembes-Lorena on December 21, 2010 about running background checks on current and potential MS-13 gang members. *Id.* at ¶ 26. In a third conversation, recorded on January 2, 2011, Guembes-Lorena tells Merino he spent the night of New Year's Eve in jail with co-defendant Abraham Iraheta due to a fight with members of the Bloods gang. *Id.* at ¶ 27. Based on these conversations, Guembes-Lorena was a known suspect in the instant case since January 6, 2011 at the latest.

Guembes-Lorena was not only a suspect in the instant case, but also a known former federal cooperator. Def.'s Br., Ex. C (Excerpts from June 20, 2011 Suppression Hearing, 07-CR-116) ("6/20/2011 Tr.") at 47. In fact, Agent Sweeney visited Guembes-Lorena's home on January 21, 2011 to inform him of a threat to his life. 9/7/2011 Tr. at 11:9–15. Despite his

knowledge of this information, Agent Sweeney testified in a suppression hearing[2] before the Hon. Sterling Johnson that he was unaware that Guembes-Lorena was participating in criminal activity at the time of his visit to Guembes-Lorena on January 21, 2011. *Id.* at 11:12–20.

Guembes-Lorena was later arrested on February 4, 2011 for an "administrative violation" relating to his immigration status. 6/20/2011 Tr. at 7:19–21, 15:1–9. Following his arrest, Guembes-Lorena was interviewed by Agent Sweeney. 9/7/2011 Tr. at 6:20–10:9. During the interview, Guembes-Lorena admitted to associating with other MS-13 members during his term of supervised release, during which time he had committed multiple crimes and violent assaults with his fellow gang members. *Id.*

The second set of alleged misrepresentations relates to statements made in the March and April affidavits regarding co-defendant Alex Machado (a/k/a "Negro"). Defendant alleges that two of the Government's affidavits falsely represented that alternative investigative means were unsuccessful because the Government was unable to identify the true name of an MS-13 member known as "Negro." However, one of those two affidavits clearly identified Machado by name in a separate paragraph. In the March affidavit, Agent Sweeney provides a "toll analysis" of Merino's phone, explaining that Merino had used the phone to exchange thirteen "dirty" wire communications with Machado. Mar. 2, 2011 Aff. at ¶¶ 34, 37–38 ("Dirty Telephone #2, Alex Machado, also known as 'Negro'"). The March affidavit clearly indicated the Government was aware that "Negro" was an alias of Alex Machado. *Id.* Nevertheless, both the March and April affidavits assert alternative investigative means were unsuccessful because CW1 and law enforcement had been unable to verify Machado's name. *Id.* at ¶ 75 ("[A]lthough CW1 has identified two MS-13 members by their nicknames, 'Negro' and 'Estrano,' he has not been able

---

[2] The suppression hearing was conducted in connection with the revocation of Guembes-Lorena's supervised release, arising from a separate criminal case captioned *United States v. Guembes-Lorena*, 07-CR-116 (E.D.N.Y. Sept. 7, 2011) (Johnson, J.).

to fully identify these individuals, and special agents participating in this investigation have similarly been unable to identify them."); Apr. 1, 2011 Aff. at ¶ 65 (same).

## II. Discussion

### A. Motion to Suppress

In order to approve a wiretap application, the district court must determine that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). This statutory language "is simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974). As the Second Circuit has explained:

> The purpose of the statutory requirements is not to preclude resort to electronic surveillance until after all other possible means of investigation have been exhausted by investigative agents; rather, they only require that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods.

*United States v. Torres*, 901 F.2d 205, 231 (2d Cir. 1990) (internal editing and citation omitted), *abrogated on other grounds as recognized by United States v. Marcus*, 628 F.3d 36, 41 (2d Cir. 2010). Therefore, to comply with the requirements of 18 U.S.C. § 2518, "[t]he government must demonstrate only that normal investigative techniques would prove difficult, not that they would be doomed to failure." *United States v. Scala*, 388 F. Supp. 2d 396, 404 (S.D.N.Y. 2005) (Kaplan, J.). Furthermore, the Court is mindful that a reviewing court's determination as to whether a wiretap was properly authorized "is not *de novo* but is limited to determining whether that judicial officer had a 'substantial basis' for [his] determination." *United States v. Gotti*, 42 F. Supp. 2d 252, 262 (S.D.N.Y. 1999) (Parker, J.) (citing *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993)).

Defendant moves to suppress all evidence against him flowing from the wiretaps on Merino's phone. Defendant points to the wealth of evidence the Government *was* able to uncover through alternative investigative techniques, arguing the Government did not satisfy its burden under 18 U.S.C. § 2518. Def.'s Br. at 9–11. Defendant focuses primarily on CW1 and the information he was able to provide to the Government through his association with Merino, the leader of the Flushing MS-13 clique. For example, CW1 recounted or recorded multiple conversations where Merino discussed future assaults, admitted to past assaults, and mentioned the seizure of a firearm from co-defendant Wilber Baires in August 2010. *Id.* at 10. CW1 also recorded a lengthy gang meeting with a body wire, which resulted in a 182-page transcript. *Id.* Defendant also points out that several individual members of MS-13 provided incriminating statements to law enforcement before and during the course of the wiretaps. *Id.* at 9–10. Thus, Defendant argues, "[t]here is no reason to believe that the successful means the government employed would have stopped producing results in the absence of a wiretap." Def.'s Br. at 11.

The Government responds that the "[p]iecemeal information obtained from individual gang members" would not have given the Government access to the full scope of the gang's criminal activities. Gov't Opp. Br. at 17–18; *see also* Dec. 2, 2010 Aff. at ¶ 48 (stating that the Government was seeking, *inter alia*, "the full nature, extent and methods of operation of the gang activities" of MS-13 members, both known and unknown, as well as "the identities and roles of accomplices, aiders and abettors, co-conspirators and participants in their illegal activities"). As indicated in Agent Sweeney's affidavits, MS-13 "compartmentalizes aspects of its operations so as to impede law enforcement's ability to identify and dismantle the entire organization." *See, e.g.*, Dec. 2, 2010 Aff. at ¶ 55. Therefore, the Government asserts, alternative investigative techniques were inadequate, as they could only uncover discrete pieces of evidence implicating

individual gang members or crimes. While such evidence could lead to successful prosecutions of individual gang members, it would not necessarily allow the Government to dismantle MS-13 as an organization. On the other hand, a wiretap of the Flushing clique leader's phone would yield the type of top-down intelligence necessary to accomplish that goal. Gov't Opp. Br. at 17–18. Defendant responds that under the "full nature, extent and methods" standard propounded by the Government, "the existence of any information beyond investigative intelligence immediately available would justify authorization to intercept communications." Def.'s Reply Br. at 2.

Defendant's argument sweeps too broadly, and the Court concludes there was a substantial basis for the authorizing courts' determination that alternative investigative means were too difficult or dangerous to use in achieving the stated objectives of the investigation.[3] Many courts in the Second Circuit have held that wiretaps are permissible where normal investigative techniques are able to uncover evidence of discrete crimes by members of a criminal enterprise but not able to uncover evidence of the scope of the enterprise as a whole. *See, e.g.*, *Scala*, 388 F. Supp. 2d at 404 (wiretaps authorized to intercept conversations regarding matters that traditional investigative means had been unable to explore, such as the identities of defendant's associates and accomplices, the locations of defendant's gambling operations, and the details of how defendant's illegal gambling and loansharking activities were carried out); *United States v. King*, 991 F. Supp. 77, 87–88 (E.D.N.Y. 1998) (Gershon, J.) (wiretap appropriate where traditional means had successfully identified certain members of conspiracy and produced direct sales of drugs and guns from defendant, but had been unable to identify defendant's narcotics "sources or all of the other members of the organization who were

---

[3] The January, March, and April wiretap authorizations were issued by the Hon. Jack Weinstein. Jan. 6, 2011 Aff. at 55; Mar. 2, 2011 Aff. at 51; April 1, 2011 Aff. at 48. The February order was issued by the Hon. Allyne R. Ross. Feb. 3, 2011 Aff. at 49.

involved in a conspiracy with" defendant); *United States v. Rodriguez*, 734 F. Sup. 116, 122

(S.D.N.Y. 1990) (Stanton, J.) (wiretap appropriate where alternative investigative techniques

were "unsuccessful in uncovering the full scope of the conspiracy," including "the identity of

many of the other members of the organization . . . the locations where the narcotics and other

evidence of narcotics trafficking were being stored, and . . . many significant details about the

inner workings of the organization"); *United States v. Kazarian*, No. 10 Cr. 895, 2012 WL

1810214, at *13 (S.D.N.Y. May 18, 2012) (Gardephe, J.) ("This was an investigation of a

complex and far-flung criminal enterprise . . . . The wiretap applications adequately explain why

electronic surveillance is necessary to identify all participants in the specified unlawful activities

and the full scope of those illegal activities."). Although alternative investigative techniques had,

as Defendant contends, produced evidence sufficient to prosecute Merino, the leader of the

Flushing clique, the goal of the investigation was "not merely the apprehension of [a single]

defendant, but the gathering of evidence beyond a reasonable doubt about [the entire criminal

enterprise, including associates] and subordinates." *United States v. Hogan*, 122 F. Supp. 2d

358, 365 (E.D.N.Y. 2000) (Platt, J.). As the Second Circuit held in *United States v. Hinton*,

"even though state or federal officers may have garnered sufficient information without the use

of wiretaps to support an indictment against [a low-level conspirator], and possibly against a few

others, there was every reason to believe that additional co-conspirators were involved who

could not be successfully investigated without wiretapping." 543 F.2d 1002, 1011 (2d Cir.

1976).

The use of a wiretap was permissible in this case not because *any* information was

beyond law enforcement's immediate investigative reach—*i.e.*, an argument based on mere

expediency—but because normal investigative techniques were incapable of uncovering a

13

specific type of information: operational information privy only to high-level MS-13 members such as Merino. Agent Sweeney's affidavits chronicled in great detail why the use of confidential informants, undercover agents, surveillance, search and arrest warrants, grand jury interviews, witness interviews, pen register data, consensually recorded phone calls, trash inspection, and criminal database checks was of limited value in uncovering the full scope of MS-13's criminal activities. At best, evidence discovered through these techniques would have allowed law enforcement to prosecute individual members of a local chapter of an international criminal gang for gang-related assaults. As Defendant correctly points out, there is no reason to doubt these techniques would have continued to produce results in the absence of a wiretap. But those results would have been of limited value in uncovering the full scope of MS-13's activities and ultimately dismantling the organization.

By contrast, the wiretaps allowed law enforcement to identify the names and contact information of many additional MS-13 members. Intercepted communications also uncovered plans to resurrect a local chapter of MS-13 and to facilitate the illegal reentry of an El Salvador-based gang member. At the end of the day, there is a difference between the partial and incomplete evidence provided by low-level thugs such as CW1 and evidence available through wiretaps of the phone of the leader of the Flushing clique. Agent Sweeney adequately informed the authorizing courts of "the nature and progress of the investigation and the difficulties inherent in the use of normal law enforcement methods," consistent with his obligation under 18 U.S.C. § 2518(3)(c). *Torres*, 901 F.2d at 231 (internal quotation marks omitted). The Court therefore concludes the authorizing courts had a substantial basis to conclude alternative investigative techniques could not uncover the full scope of MS-13's criminal activities. Hence,

14

the orders of authorization for the wiretaps were lawful, and Defendant's motion to suppress is denied with prejudice.

## B. *Franks* Hearing

In *Franks v. Delaware*, the Supreme Court held that although a presumption of validity attaches to a law enforcement affidavit, the Fourth Amendment entitles a criminal defendant to challenge the veracity of a warrant under certain circumstances. 438 U.S. 154, 171–72 (1978). Such a challenge may be brought in the context of a wiretap application and authorization under 18 U.S.C. § 2518. *United States v. Bianco*, 998 F.2d 1112, 1126 (2d Cir. 1993), *abrogated on other grounds as recognized by United States v. Rosa*, 626 F.3d 56, 57 (2d Cir. 2010). In *Franks*, the Supreme Court established a two-part test to determine whether a criminal defendant should be entitled to an evidentiary hearing regarding whether the Government provided misleading or false information in a warrant affidavit. 438 U.S. at 171–72. First, the defendant must make "allegations of deliberate falsehood or of reckless disregard for the truth," and those allegations "must be accompanied by an offer of proof." *Id.* at 171. Second, even if those requirements are met, "if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *Id.* at 171–72.

In the context of the *Franks* doctrine, "[a] misrepresentation or omission is intentional when the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth." *United States v. Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003) (internal quotation marks and citation omitted). "A false statement is material when the alleged falsehoods or omissions were necessary to the issuing judge's probable cause finding." *United States v. Martin*, 426 F.3d 68, 73 (2d Cir. 2005) (internal quotation marks, editing, and citation

omitted). "[T]he ultimate inquiry is whether, after putting aside erroneous information and material omissions, there remains a residue of independent and lawful information sufficient to support probable cause." *Id.* at 74 (internal quotation marks, citation, and editing omitted). "A judge's probable-cause determination is not overly strict." *Id.* When presented with a warrant, the court must "simply . . . make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

Defendant argues he is entitled to a *Franks* hearing because the Government included two sets of factual misrepresentations in its affidavits requesting the wiretaps. First, he points to the discrepancy between, on the one hand, the recordings of "dirty" calls between Merino and Rudy Guembes-Lorena as listed in the January 2011 affidavit and, on the other, Agent Sweeney's testimony before Judge Sterling that, on January 21, 2011, he had no knowledge of any criminal activity on the part of Guembes-Lorena. This discrepancy, however, falls far short of making a "substantial preliminary showing" that the January 2011 affidavit contained deliberately or recklessly false information. Indeed, Defendant has neither cited anything in the record nor even suggested the recordings in the January 2011 affidavit were false. At best, the discrepancy between the January 2011 affidavit and Agent Sweeney's later testimony in an unrelated proceeding suggests Agent Sweeney made a misrepresentation, either intentionally or unintentionally, at the hearing before Judge Johnson. Because Defendant has not produced evidence showing the January 2011 affidavit contained any misrepresentations regarding Guembes-Lorena, much less intentional or reckless misrepresentations, a *Franks* hearing is unwarranted. Moreover, as the record strongly suggests the aforementioned inconsistency was

16

not a deliberate misrepresentation, the Court need not consider whether it was material to the authorizing court's decision to approve the wiretap.

Second, Defendant takes issue with statements in the March and April 2011 affidavits that law enforcement had been unable to determine the true name of an MS-13 gang member known as "Negro." Elsewhere in the affidavits, Agent Sweeney notes the Government had identified Negro as Alex Machado, and recorded Merino speaking with Machado about criminal activity. Although the Government's stated inability to identify "Negro" is contradicted by the identification noted elsewhere, this "misrepresentation" also does not call for a *Franks* hearing. The December 2010, January 2011, and February 2011 affidavits all contain the same statement regarding law enforcement's inability to determine Negro's identity. Dec. 2, 2010 Aff. at ¶ 67, Jan. 6, 2011 Aff. at ¶ 75, Feb. 3, 2011 Aff. at ¶ 74. Under these circumstances, the Court finds it unlikely that the inclusion of the statement in the March and April 2011 affidavits was a calculated effort to mislead the Court. Instead, the inclusion of the erroneous statement regarding law enforcement's inability to determine Negro's true name appears to have been an unfortunate oversight in updating prior versions of the affidavit—a failure to account for new facts learned in the course of the investigation. This isolated mistake does not constitute an intentional or reckless falsehood.

Even assuming *arguendo* that Agent Sweeney's misrepresentation in the March and April 2011 affidavits was intentional or reckless, Defendant has not shown the falsehood was "necessary to the issuing judge's probable cause finding." *Martin*, 426 F.3d at 73 (internal editing omitted). The inability to learn Negro's identity was but one of many reasons cited in the affidavits as to why alternative investigative techniques were inadequate to achieve the goals of the investigation. There is no reason to believe Judge Weinstein would not have granted the

17

Government's applications to extend the wiretap in March and April 2011 absent the single

sentence regarding the Government's inability to learn Negro's true name. By contrast, had

Defendant pointed to inconsistencies regarding crucial statements such as Agent Sweeney's

representation that CW1 "does not hold a high-level leadership position in MS-13, and thus is

not privy to numerous critical discussions regarding MS-13-related activities," *see, e.g.*, Mar. 2,

2011 Aff. at ¶ 59, he might have been able to show the need for a *Franks* hearing, but such is not

the case here. Therefore, the Court concludes the incorrect statement in the March and April

2011 affidavits was neither intentionally made nor material to Judge Weinstein's determination

that alternative investigative techniques were insufficient to achieve the purposes of the

investigation. Accordingly, Defendant's motion for a *Franks* hearing is denied with prejudice.

### C. Discovery of Rule 16 Material

Pursuant to Rule 16 of the Federal Rules of Criminal Procedure, Defendant seeks the

following material from the Government:

- Any NYPD, joint task force, or FBI arrest reports relating to any co-defendant or individual referenced in the wiretap affidavits;

- Any NYPD, joint task force, or FBI incident reports relating to any co-defendant or individual referenced in the wiretap affidavits, including but not limited to any reports regarding the September 24, 2010 stabbing or the September 29, 2010 incident mentioned in the affidavits;

- Any statements to law enforcement by a co-defendant or individual named or referenced in the affidavits relating to the charges, the defendants, or MS-13, other than statements made by an active cooperating witness, which may comprise 18 U.S.C. § 3500 material in the instant case, including but not limited to any statement to law enforcement by co-defendant Abraham Iraheta referenced in the affidavits or Rudy Guembes-Lorena in *United States v. Guembes-Lorena*, 07-CR-116.

Def.'s Br. at 13–14.

18

Rule 16 of the Federal Rules of Criminal Procedure states, in pertinent part, that upon a defendant's request, "the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and . . . the item is material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E)(i).

Defendant argues he is entitled to the material listed above because it is necessary in order to prepare his defense with respect to two related issues: (1) whether alternative investigative techniques were indeed inadequate, justifying the authorization of the wiretap on Merino's phone; and (2) whether the Government provided misleading or false information that was material to the authorizing court's decision to authorize the wiretap, potentially calling for a *Franks* hearing. Def.'s Br. at 15. Specifically, Defendant argues the February 4, 2011 arrest of Guembes-Lorena and his post-arrest statements undermine Agent Sweeney's claim that arrests were premature. *Id.* Defendant also asserts incident reports relating to the September 24, 2010 stabbing and the failed September 29, 2010 assault would aid the defense in showing law enforcement was successful in gathering information through alternative investigative means prior to resorting to the wiretap. *Id.*

However, Rule 16(a)(2) of the Federal Rules of Criminal Procedure limits the information that a criminal defendant is entitled to receive. The rule states:

> Except as Rule 16(a)(1) provides otherwise, this rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case. Nor does this rule authorize the discovery or inspection of statements made by prospective government witnesses except as provided in 18 U.S.C. § 3500.

19

Fed. R. Crim. P. 16(a)(2). The plain language of Rule 16(a)(2) shields the Government from producing arrest or incident reports prepared by local or federal law enforcement. Furthermore, case law interpreting Rule 16(a)(2) is legion and overwhelmingly refutes Defendant's argument that he is entitled to the discovery material listed above.

"[I]n a federal prosecution based in part upon the investigative efforts of local or state law enforcement agents, Rule 16(a)(2) bars disclosure of reports generated by such agents; and . . . it makes no difference whether the local or state agents generated their reports as part of an independent investigation or during the course of a joint federal operation." *United States v. Cherry*, 876 F. Supp. 547, 551 (S.D.N.Y. 1995) (Haight, J.). Therefore, any incident or arrest reports generated by law enforcement in connection with the case at hand, whether federal or local, are protected from disclosure under Rule 16(a)(2). *See United States v. Koskerides*, 877 F.2d 1129, 1133–34 (2d Cir. 1989) (protecting IRS agent's tax report from discovery on the ground that "reports, memoranda, or other internal government documents made by . . . government agents in connection with the investigation or prosecution of the case are not subject to disclosure"); *United States v. Feola*, 651 F. Supp. 1068, 1142–43 (S.D.N.Y. 1987) (Brieant, J.) (DEA investigative files and interview reports protected from discovery), *aff'd*, 875 F.2d 857 (2d Cir. 1989) (mem.); *Cherry*, 876 F. Supp. at 551; *United States v. Jenkins*, No. 02 CR. 1384, 2003 WL 1461477, at *5 (S.D.N.Y. Mar. 21, 2003) (Casey, J.) (reports produced by local law enforcement agents protected from discovery). Defendant's Rule 16 motion for disclosure of those materials is therefore denied with prejudice.

Furthermore, the Second Circuit held long ago that "Rule 16(a) simply does not encompass [the statements of co-conspirators], nor does the Jencks Act [18 U.S.C. § 3500] permit their disclosure over the objection of the government." *United States v. Percevault*, 490

F.2d 126, 131 (2d Cir. 1974). The ambit of Rule 16 is far narrower and only entitles Defendant to disclosure of statements he himself made. *See United States v. Mannino*, 480 F. Supp. 1182, 1187 (S.D.N.Y. 1979) (Sweet, J.) ("[T]here is no basis in Rule 16 or in the reported decisions for disclosure of statements other than those made by the defendant or of documentary materials concerning the circumstances of any non-consensual recording [of the defendant]."); *see also United States v. Taylor*, 707 F. Supp. 696, 701 (S.D.N.Y. 1989) (Kram, J.) (statements of co-conspirators not subject to discovery if government does not intend to introduce such statements at trial, unless statements fall within *Brady* doctrine); *United States v. Marquez*, No. 91 CR 451, 1992 WL 88139, at *5 (S.D.N.Y. Apr. 22, 1992) (Kram, J.) ("Under Second Circuit law, the defendant is not entitled to other co-conspirator statements."); *United States v. Morales*, No. 93 Cr. 291, 1993 WL 465209, at *13 (S.D.N.Y. Nov. 15, 1993) (Conboy, J.) (denying motion for discovery of all prior statements of government witnesses, co-defendants, and unindicted co-conspirators). Accordingly, Defendant's discovery request for statements made to law enforcement by co-defendants or other individuals referenced in the affidavits regarding the charges, the defendants, or MS-13 is denied with prejudice.

### D. Disclosure of *Brady* Material

It is well established that the Government must produce "evidence favorable to an accused." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Defendant moves the Court to compel the Government to disclose, pursuant to the Government's *Brady* obligations, any victim report prepared by law enforcement relating either to the charges or to any incidents mentioned in the wiretap affidavits, including any victim report from the September 24, 2010 stabbing. Def.'s Br. at 16.

21

However, Defendant's motion to compel the Government to produce *Brady* material is premature. The Second Circuit has held that "a rule that makes the timing of disclosure [of *Brady* materials] dependent on the defendant's demand is directly contrary to the principle that a prosecutor's *Brady* obligation is independent of a defendant's request for *Brady* materials." *United States v. Coppa*, 267 F.3d 132, 144 (2d Cir. 2001) (citing *United States v. Bagley*, 473 U.S. 667, 682–83 (1985)); *see also United States v. Gustus*, No. 02 CR. 888, 2002 WL 31260019, at *2 (S.D.N.Y. Oct. 8, 2002) (Swain, J.) ("[I]t is the Government's responsibility to determine what evidence is material and when such evidence should be disclosed in time for its effective use."). Ultimately, the guiding principle with respect to the timing of the Government's *Brady* disclosures states that

> as long as a defendant possesses *Brady* evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner. There is no *Brady* violation unless there is a reasonable probability that earlier disclosure of the evidence would have produced a different result at trial.

*Coppa*, 267 F.3d at 144. Defendant has neither asserted nor shown that failure to disclose any *Brady* material at this particular time would be prejudicial to his defense.

Furthermore, not only does the Government indicate that it "is not aware of any *Brady* material in victim reports or otherwise," but the Government also states it "understands its *Brady* obligations and will continue to comply with them." Gov't Opp. Br. at 26, n.15. Because "the Government has made a good faith representation to the Court and defense counsel that it recognizes and has complied with its *Brady* disclosure obligations," the motion to compel the Government to provide *Brady* material is denied without prejudice as premature. *United States v. Messina*, No. 11-CR-31, 2012 WL 463973, at *12 (E.D.N.Y. Feb. 13, 2012) (Matsumoto, J.).

22

### E. Bill of Particulars

Defendant seeks a bill of particulars from the Government, pursuant to Rule 7(f) of the

Federal Rules of Criminal Procedure, with respect to Racketeering Act One and Count Four of

the Indictment, both of which charge Defendant with participating in a conspiracy to murder

members of a rival gang, the OFC. Def.'s Br. at 17–18. Both Racketeering Act One and Count

Four allege that "[i]n or about and between July 2009 and the date of this Indictment," December

30, 2011, Defendant and co-defendants Iraheta and Merino, together with others, conspired to

murder "one or more other persons, to wit: members of a set of the rival Original Flushing Crew

gang, located in Flushing, New York." Indictment, Dkt. No. 1, at ¶¶ 8, 19. Though Defendant

does not explicitly define the particulars he is seeking, it appears he seeks particulars as to (1) the

identities of the unnamed victims of the alleged conspiracy to murder, (2) the identities of the

unnamed co-conspirators, and (3) the specific dates of the conspiracy.

Under Rule 7(c) of the Federal Rules of Criminal Procedure, an indictment need only set

forth a "plain, concise, and definite written statement of the essential facts constituting the

offense charged." Rule 7(f) of the Federal Rules of Criminal Procedure allows a defendant to

"move for a bill of particulars before or within 14 days after arraignment or at a later time if the

court permits." The purpose of a bill of particulars is "to inform a defendant of charges with

sufficient precision to allow preparation of a defense, to avoid unfair surprise, and to preclude

double jeopardy." *United States v. GAF Corp.*, 928 F.2d 1253, 1260 (2d Cir. 1991) (citing *Wong*

*Tai v. United States*, 273 U.S. 77, 82 (1927)). A bill of particulars is not required unless the

"charges of an indictment are so general that they do not advise the defendant of the specific acts

of which he is accused." *United States v. Chen*, 378 F.3d 151, 163 (2d Cir. 2004) (internal

citation omitted). "It is important to recall that a bill of particulars is not a discovery device and

'should not function to disclose evidence, witnesses, and legal theories to be offered by the Government at trial or as a general investigative tool for the defense.'" *United States v. Perryman*, 881 F. Supp. 2d 427, 430–31 (E.D.N.Y. 2012) (Spatt, J.). "Because a bill of particulars confines the Government's proof to particulars furnished, requests for a bill of particulars should not be granted where the consequence would be to restrict unduly the Government's ability to present its case." *Feola*, 651 F. Supp. at 1132. "[T]he ultimate test in determining whether a bill of particulars is appropriate is whether the information is necessary, not whether it is helpful to the defendant." *United States v. Wilson*, 493 F. Supp. 2d 364, 370 (E.D.N.Y. 2006) (Garaufis, J.) (internal quotation marks and citation omitted). "Whether to grant a bill of particulars is generally a decision entrusted to the sound discretion of the district court." *United States v. Ramirez*, 609 F.3d 495, 502 (2d Cir. 2010).

Courts in this Circuit are divided on the question of when the Government should be required to identify alleged co-conspirators in a bill of particulars. *United States v. Urso*, 369 F. Supp. 2d 254, 273 (E.D.N.Y. 2005) (Garaufis, J.) ("[T]here is no clear line dividing cases in which courts have mandated disclosure from those in which courts have declined to issue such orders."); *see also United States v. Nachamie*, 91 F. Supp. 2d 565, 572 (S.D.N.Y. 2000) (Scheindlin, J.) ("A review of the case law in this district reveals no clear distinction among circumstances in which courts grant a request for the names of unknown unindicted co-conspirators and circumstances in which they do not."). Nevertheless, there is a common thread running through cases where courts have granted disclosure: "the identities of unindicted co-conspirators have been disclosed primarily in cases in which violence was not alleged." *United States v. Santiago*, 174 F. Supp. 2d 16, 35 (S.D.N.Y. 2001) (Marrero, J.). And where courts have granted disclosure in cases involving allegations of violent crime, "there were other factors that

24

convincingly militated in favor of disclosure," such as "the large number of defendants charged," "the large number of schemes alleged," "the wide-ranging nature of the predicate acts," and "the voluminous discovery." *Id.* at 35–36. By contrast, "identifying alleged co-conspirators in a bill of particulars is inappropriate in cases where the defendant is charged with 'extreme acts of violence' in order to protect the government's investigation and the safety of unindicted co-conspirators." *Wilson*, 493 F. Supp. 2d at 372.

Because extreme acts of violence are alleged in this case, the Court adopts the same position taken by the Hon. Nicholas Garaufis in *United States v. Wilson*. In this case, Defendant is charged with conspiracy to murder. Though there are ten co-defendants charged in this case, no other factors favor disclosure. While the Indictment contains seventeen counts, all of them relate to violent crimes or immigration offenses, such that the predicate acts are not wide-ranging. Finally, Defendant has not alleged discovery in this case has been particularly voluminous. Given the extremely violent nature of MS-13 in general, and of the crimes with which Defendant is accused specifically, it would be inappropriate to compel the Government to identify unnamed alleged co-conspirators in a bill of particulars. To do so would risk the commission of additional murders and assaults against co-conspirators and their friends, families, or associates. Defendant's motion for a bill of particulars as to the identities of unnamed co-conspirators is therefore denied with prejudice.

Likewise, the Court denies with prejudice Defendant's motion for a bill of particulars as to the specific dates of the conspiracy. "As a general rule, a defendant is not entitled to receive details of the government's conspiracy allegations in a bill of particulars." *Id.* (denying motion for bill of particulars as to "the dates on which [defendant] and his codefendants allegedly joined the racketeering enterprise and related conspiracies, and the date(s) and location(s) of any related

meetings [defendant] attended, the dates [defendant] and the other defendants last participated in the conspiracies, and the nature of overt acts" committed in furtherance of the conspiracies). "Details regarding the date on which the conspiracy was formed, or when each participant entered into the conspiracy need not be revealed before trial." *Id.* (citations omitted). Moreover, the Indictment sets forth the approximate dates during which Defendant allegedly conspired to kill members of the OFC—between July 2009 and December 30, 2011. MS-13 membership allegedly carries with it a standing obligation to assault or murder members of rival gangs whenever possible, and members of the MS-13 clique in Queens have long been engaged in street wars with members of the OFC. Gov't Opp. Br. at 1–2. Therefore, it is unsurprising that Defendant and other fellow gang members would allegedly conspire to kill members of the OFC over a period of time rather than on discrete dates. Because the Government has no obligation to disclose the details of its conspiracy allegations with respect to specific dates, and because the Indictment already adequately informs Defendant of the date range of the murder conspiracy, Defendant's motion for a bill of particulars as to the dates of the conspiracy is denied with prejudice.

Finally, the Court, in its sound discretion, denies with prejudice Defendant's motion for a bill of particulars as to the identities of the unnamed victims of the alleged murder conspiracy. A bill of particulars is required only where the "charges of an indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *Chen*, 378 F.3d at 163. Here, the Indictment explains the intended victims of the murder conspiracy were members of the rival OFC gang, during a time when the OFC and MS-13 were engaged in an ongoing street war. Just as the Government is not obligated to disclose the specific dates of the murder conspiracy, the Government need not disclose the names of the murder conspiracy's intended

victims in order for Defendant to be adequately apprised of the specific crimes of which he is accused. *See Perryman*, 881 F. Supp. 2d at 430–31 (bill of particulars unwarranted, even where indictment did not disclose name of intended victim of gang-related murder conspiracy). This is especially true in this case, where MS-13 gang members were continually expected to attack any and all members of the OFC on sight.

Defendant fails to cite any controlling authority to the contrary. Defendant's lead case on this point is *United States v. Davidoff*, in which the Second Circuit found the trial court had exceeded its discretion in a RICO prosecution "by denying a bill of particulars identifying . . . least the victims of discrete extortionate schemes that the prosecution intended to prove." 845 F.2d 1151, 1154 (2d Cir. 1988). In *Davidoff*, the defendant was charged with racketeering based on various predicate extortion schemes leveled against companies named in the indictment. *Id.* The district court declined to direct the Government to specify, prior to trial, any extortion schemes beyond those specified in the indictment. *Id.* At trial, the defendant was "confronted with evidence of extortions aimed at entirely different companies," none of them named in the indictment or otherwise disclosed prior to trial. *Id.* Therefore, the Second Circuit reversed the district court's denial, reasoning it was "simply unrealistic to think that a defendant preparing to meet charges of extorting funds from one company had a fair opportunity to defend against allegations of extortions against unrelated companies, allegations not made prior to trial." *Id.*

By contrast, in this case, there is no indication the Government intends to prove allegations of murder conspiracies other than those alleged in the Indictment. Moreover, as to the murder conspiracy alleged in Racketeering Act One and Count Four, the Indictment fairly informs Defendant that the Government intends to prove Defendant conspired with co-defendants Iraheta and Merino to murder members of the OFC between July 2009 and December

27

30, 2011, which information should allow Defendant to adequately prepare his defense. Under these circumstances, and especially given the aforementioned concerns regarding MS-13's reputation for violence, it would be inappropriate at this time to order the Government to disclose the names of the intended victims of the murder conspiracy. *See Perryman*, 881 F. Supp. 2d at 430–31.

Furthermore, the Government has represented that, as the trial date approaches, it will file a Rule 404(b) motion setting out "other crime" evidence, as well as "further particularization regarding acts that were in furtherance of [the murder] conspiracy that are not described specifically in the indictment." Tr. of Oral Arg., Dkt. No. 142, at 24:9–15. "This concession by the Government goes far beyond its obligation at this point in this case" and serves to allay concerns that Defendant will be unable to adequately prepare his defense prior to trial. *Perryman*, 881 F. Supp. 2d at 430.

The Court also notes that Defendant failed to move for a bill of particulars within fourteen days of his arraignment, as required by Rule 7(f) of the Federal Rules of Criminal Procedure.[4] Because the Court did not grant Defendant permission to move for a bill of particulars "at a later time," Fed. R. Crim. P. 7(f), Defendant's failure to move within the fourteen-day period provides additional grounds for denying a bill of particulars as to the identities of the unnamed victims of the murder conspiracy.

## III. Conclusion

For the reasons discussed above, Defendant's motions are denied. The Court DENIES WITH PREJUDICE Defendant's motions to suppress evidence derived from the wiretap on co-defendant Christian Merino's phone, for a *Franks* hearing, for Rule 16 discovery, and for a bill

---

[4] Defendant was arraigned before Magistrate Judge Joan Azrack on January 5, 2012. *See* Dkt. No. 12. However, Defendant did not formally move for a bill of particulars until December 10, 2012. *See* Def.'s Br., Dkt. No. 118.

28

of particulars specifying the identities of co-conspirators, the dates of the murder conspiracy underlying Racketeering Act One and Count Four of the Indictment, and the members of the OFC who were the intended victims of said alleged murder conspiracy. The Court DENIES WITHOUT PREJUDICE, as premature, Defendant's motion to compel disclosure of *Brady* material.

**<u>SO ORDERED</u>**

Dated: Brooklyn, New York
      June 20, 2013

s/WFK

HON. WILLIAM F. KUNTZ, II
United States District Judge